# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br><br>vs.<br><br>JASON P. BRISCOE,<br><br>*Defendant.* | Case No. 18-10031-EFM<br>Case No. 22-1116-EFM |

## MEMORANDUM AND ORDER

A jury convicted Defendant Jason P. Briscoe of multiple drug and firearm offenses, and has been sentenced to 220 months imprisonment.  His conviction was affirmed on appeal.  The matter is now before the Court on Defendant's Motion to Vacate his sentence under 28 U.S.C. § 2255, which argues that his constitutional rights were violated when a Court Information Technology (IT) specialist entered the jury room and showed the jury how to operate video equipment. (Doc. 138).  In addition, Defendant has moved for full discovery and an evidentiary hearing (Doc. 139), and has moved to strike the Government's most recent responsive pleading. (Doc. 164).  For the reasons explained in the present Order, the Court denies the motions.

## I.     Factual and Procedural Background

The Government charged Defendant Jason P. Briscoe with one count of possession of methamphetamine,[1] two counts of possession of a firearm in furtherance of a drug trafficking crime,[2] and six counts of possession of possession of ammunition or a firearm by a felon.[3]  On May 3, 2019, after a three-day trial, the jury convicted Defendant on all nine counts.

On appeal,  the Tenth Circuit determined that Defendant could not be sentenced on more than one of the respective armed drug trafficking (§ 924(c)) and felon-in-possession charges (§ 924(g)) offenses.  Accordingly, on May 5, 2021, the Court entered an Amended Judgment reflecting Defendant's conviction of Counts 1, 2 and 4, and resentenced him to a term of imprisonment of 220 months.

In his Motion to Vacate, Defendant presents the statement of the attorney who was appointed to represent him during the trial.  After the trial was concluded, consistent with the usual practice of the Court, the attorneys for the parties were invited to consult with jurors as to what each might have found persuasive or unpersuasive.  Defendant's former counsel states that during this session she learned that the jury at some point wished to review video evidence in slow motion, "essentially frame-by-frame," and asked for assistance in operating the equipment in the jury room.  Counsel states that she was not aware of the request, and states that the video

---

[1] Violating 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).

[2] In violation of 18 U.S.C. § 924(c).

[3] In violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).

2

had not been shown during the trial in such a fashion. Former counsel states that she then conducted no further investigation or research into the issue.

At trial, the Government had presented evidence relating to Defendant's March 6, 2018 arrest, including his flight from officers and the subsequent discovery of a firearm along his flight path. About three hours after the arrest, officers searching the flight path also found a maroon bag with drugs, ammunition, and another gun. The bag was found in a hole in the skirting of a trailer along the flight path.

The Government also presented a video extracted from a cellphone Defendant had during his flight. The video depicts a woman in a room containing what appear to be two firearms on a table, among other items. The Government also presented two still photos from the video, and Defendant has stipulated that his legs were the legs depicted in the bottom of one of the photos.

After the Motion, the Court conducted an extensive hearing on how to address the issues raised, seeking to balance both Defendant's interest in discovering what occurred at this stage of the trial, with the right of the jurors to avoid intrusion into their privacy of their deliberations. This concern was coupled with the strong likelihood that—unless something truly unusual or in contradiction to the Court's directions on deliberations occurred—the jurors would be unlikely to remember little of a technical explanation of how to operate video equipment some three years later.

Federal Rule of Evidence 606(b) limits the admissibility of evidence of a jury's deliberations. Under Rule 606(b)(1):

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

However, a juror may provide sworn testimony as to "whether . . . an outside influence was improperly brought to bear on any juror."[4]

The Court allowed the jurors to be contacted by letter to determine whether each would agree to be interviewed about their experiences. The jurors agreeing were then interviewed jointly by representatives for the parties.

The parties have submitted a stipulation which sets forth the results of their contacts with the six jurors who agreed to be interviewed. As to the relevant time, the parties stipulate:

8. One juror explained that there was a problem getting the video to work, but she could not recall what the specific problem was. Another juror remembered that the jury needed help with the video, but she did not remember why. Another juror remembered "a tech issue" with the video, but could not recall what the problem was. Another juror remembered the jury "having trouble" watching the video and thought the problem was that it wouldn't play at all.

9. One juror thought that the jury asked a question by writing it down and then knocking on the door to the jury room. She did not remember who took the questions from the jury or how the questions were answered. Another juror thought the jury wrote their questions and then "got ahold of court staff somehow," though she wasn't sure if that contact was made by calling or some other way. This juror did not think that anyone was stationed outside of the jury room door. Another juror thought the jury "called someone" when it had a question and then wrote the question down. This person did not remember there being anyone seated outside the jury room door.

10. The jurors generally reported that a male "tech person" or "IT person" came into the jury room in response to their request for help to show the jurors how to work the video. One juror described the person as a different person from the bailiff. Another juror reported that he did not think anyone besides the IT person was in the room while the problem was being fixed.

11. One juror reported that a man came into the jury room and fixed the problem, and that it took 15 or 20 minutes to fix, definitely "less than thirty minutes." He said the jury "sat around" in the jury room during this time, but he did not remember whether the jury continued to discuss the case while the video problem was being fixed.

---

[4] Fed. R. Evid. 606(b)(2)(B).

12. Another juror reported that it took the person maybe 10 minutes to fix the problem with the video.  This juror could not remember what the jury was doing while the person fixed the problem with the video but he thought the jury wasn't supposed to talk about the case.

13. Another juror reported that she didn't know if the man said anything or how long he stayed; she guessed maybe 5 minutes.

14. Another juror reported that she didn't think the person stayed very long but isn't sure how long he was in the jury room.  She thought he helped the jury work the equipment and then left.

16. The jurors watched the video "many" times, "twenty times maybe."  They stopped and started it many times, and watched it frame-by-frame.

17. One juror remembered someone on the jury, possibly the foreman, worked the video system and stopped and started the video while the jury viewed it together. Another juror also reported that one of the jurors worked the video equipment.

18. Law clerk Alex Rindels served as bailiff at Mr. Briscoe's trial.  Mr. Rindels was interviewed in October 2022.  Mr. Rindels reported that he does not believe that he was sworn in for the Briscoe trial or any other trials he participated in for the Court as a law clerk or bailiff. Mr. Rindels did not independently recall whether or not there were any jury questions in the Briscoe trial.  He did recall receiving a call to his direct line from a deliberating jury that asked for help with a video.  He could not say for sure whether or not it was the Briscoe trial.  Mr. Rindels recalled calling Matt Koochel, the Court's IT workleader, because he considered the request for help with a video to be an IT request.  After he called Mr. Koochel, he did not hear anything further about the matter and assumed it was handled.

19. Matt Koochel, the Court's IT workleader, was interviewed in October 2022. Mr. Koochel did not have a specific memory of helping a jury slow down a video.  He did not recall a time where he was ever alone with jurors in the jury room.  He did not recall the Briscoe trial specifically.  According to Mr. Koochel, in the normal course of events when he is contacted about a technical issue in the jury room, he would be accompanied by the clerk or someone else from chambers.  He did not recall training or instruction about contact with jurors.

20. The jurors' mid-deliberations request for help viewing a video was not brought to the attention of counsel for either the government or Mr. Briscoe before the jury returned its verdict.[5]

---

[5] The Court omits the Stipulation's reference citation to particular interviews.

In his Motion to Vacate, Defendant argues that the entry of the IT technician into the jury room "during deliberations" violated his right to an impartial jury, (2) violated his right to be present at critical stages of the trial, a right protected by Due Process and the Rules of Criminal Procedure[6]; (3) violated his Sixth Amendment right to counsel; and (4) violated his Due Process right to fundamental fairness.  He also argues (5) that his trial counsel was constitutionally ineffective, and (6) that the collective effect of these errors also violated his rights.

## II.     Legal Standard

As per 28 U.S.C. § 2255(a):

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

According to Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts:

> The judge who receives the motion must promptly examine it. If it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion . . . . If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order.

The court must hold an evidentiary hearing on a § 2255 motion "[u]unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[7]  The

---

[6] Fed. R. Crim. P. 43.

[7] 28 U.S.C. § 2255(b).

petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[8] An evidentiary hearing is not necessary where a § 2255 motion contains factual allegations that are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[9]

### III.     Analysis

**A.     The Court will not strike the Government's Pleading.**

Following the Stipulation as to the results of the juror interviews, the Court entered a short Order noting the submission and observed:

> The parties have also informed the Court that no further argument on these factual matters is needed.  The Court therefore orders that any briefs in summation of this case which the parties wish to submit be filed no later than March 15, 2023 and be limited to no more than fifteen pages.  Response briefs to such summations may be filed no later than March 22, 2023 and will be limited to no more than seven pages.  The Court will then issue its decision on this matter.

The Order reflects the view of the Court that it understands the issues presented by Defendant's motion and that the matter is ripe for resolution.

Defendant duly filed a Memorandum on March 15, 2023.   In contrast to the original Motion to Vacate, the Memorandum primarily focuses of the allegation that Defendant was deprived of his Sixth Amendment right to the effective assistance of counsel as well as his Due Process right to fundamental fairness.  Defendant argues  "[t]he evidence is in virtual equipoise

---

[8] *See Hatch v. Okla.*, 58 F.3d 1447, 1471 (10th Cir. 1995) (addressing requirements in habeas corpus petition), *overruled in part on other grounds by Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001).

[9] *See id.* (stating that "the allegations must be specific and particularized, not general or conclusory"); *see also United States v. Fisher*, 38 F.3d 1144, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that were merely conclusory in nature and without supporting factual averments).

about the effects" of the jury room IT technician's explanation of how to operate the video equipment, and that the burden is on the Government to show the event caused no prejudice.

Two days after the Defendant's submission, the Government filed a response stating that (1) there were no constitutional violations, (2) the burden was on the Defendant to show actual prejudice as to his claims that his substantive constitutional rights were violated and he failed to do so; (3) Defendant's claims of ineffective assistance of counsel were precluded by both a similar failure to show prejudice and a failure to show any deficient performance, and (4) in any event Defendant had procedurally defaulted on his present arguments.

Defendant has separately moved to strike "the government's entire pleading as untimely, wasteful, and waived."  Although the request is to strike the entire pleading, the heavy focus of the motion is directed at the Government's procedural default argument.  Defendant summarizes the extensive procedures employed to contact and interview jurors, and complains that "[a]t no time during this process did the government raise any procedural defenses to Mr. Briscoe's claims or suggest that the juror interviews might not be necessary because, in its view, the case should be dismissed on procedural grounds."  If the Court does not strike the entire pleading, Defendant asks for leave to file a further response brief.

Unsurprisingly, the Government has responded to the Motion to Strike by stating the Court should not grant such relief.  But it also argues that, if necessary to address its procedural default argument, the Court might allow Defendant an additional time to respond, followed by an additional reply by the Government.

The Court denies both the request to strike and the request for leave to file additional briefing.  As noted earlier, the Court views the present matter as ripe for decision.  The only issue in the Government's pleading which has not been previously touched upon or immediately

apparent from the Motion to Vacate is the procedural default argument.  As explained below, the Court concludes that it need not address the issue, and the Court concludes on the merits that Defendant has failed to show any violation of his constitutional rights.

As to the Government's arguments on the merits, there can be no real suggestion that it has waived responding to the Motion to Vacate, in light of the history of the case since the filing of Defendant's Motion to Vacate.

Although the Government did file what is ostensibly entitled a Response to the original Motion to Vacate, that pleading is manifestly a simple placeholder for any genuine response on the merits.  In that short pleading, Government offered no substantive response to *any* of the six alleged constitutional violations claimed in Defendant's Motion to Vacate.  Rather, the Government stated that "[w]hile Defendant has identified a concern relating to the assistance provided by this Court during the jury's deliberations, it is not clear that this concern rises to the level of a legally cognizable issue upon which any remedy may be sought or granted."  The Government agreed that some fact-finding was warranted, but disagreed with Defendant's request for independent, *ex parte* communications.  The Government argued that "[t]his Court should defer ruling on both of Defendant's motions [to vacate and for discovery] because they are premature" in light of the existing state of the evidence.

Defendant's Reply, unsurprisingly, disagreed with what approach to take juror interviews.  Defendant urged the court to allow an investigator for the Public Defender's office to contact jurors and if needed to "expand the record with any statements the proposed interviews generate."  Notably, however, the Reply did not argue at the time that the Government had somehow committed itself to offering no substantive opposition to the arguments made in the Motion to Vacate.

The Court conducted a hearing on the parties' discovery proposals, and authorized the parties to speak with the law clerk and the IT technician who were involved with the case. Defendant subsequently filed a Status Report explaining what was learned during those interviews, and proposing a procedure for attempting to contact jurors. The Government duly filed a Response. Again, the only issue addressed in both the pleadings was the procedural question of how to interview the jurors. Neither pleading suggested directly or indirectly that the Government would not file a substantive response to the Motion to Vacate once discovery was completed.

There is simply no basis in the record for concluding that the Government would waive the ability to dispute the merits of Defendant's claims. The pleading which Defendant now seeks to strike is in fact the Government's first pleading to directly address the issue.

The only remaining grounds for striking the pleading is the Defendant's claim that it is untimely. This is unpersuasive. To the extent the pleading is considered the Government's summation brief in response to the Court's Scheduling Order, it was two days late, but the Court can perceive no prejudice from this brief delay which would warrant the drastic remedy of striking the pleading. Alternatively, the pleading could be considered the Government's timely response to the Defendants summation brief. The pleading itself supports this conclusion, as it offers a rejoinder to Defendant's argument as to which party bears the burden of proof.

In summary, the Court will not strike the Government's brief, and finds the matter is ripe for decision on the merits without additional pleadings.

**B.      The IT technician did not intrude on the jury during its deliberations.**

Defendant repeatedly states that the frame-by-frame viewing occurred "during deliberations," and occurred when the jury was "deadlocked."  Both statements are contrary to the evidence and to common usage of those terms.

At the time the IT technician entered the jury room, the jury had not reached a verdict. The jury had taken a preliminary vote and was not yet in agreement on a verdict.  But there is no indication that at that time or any point did the jury ever believe they were deadlocked. Deliberation assumes that jurors will change their views as they discuss the case, and a temporary lack of agreement is not a deadlock.[10]  A jury is deadlocked if there is no apparent possibility that the jury will be able to reach a verdict after further deliberations.[11]

Similarly, the assertion that the IT technician entered the jury room "during deliberations" is misleading.  The phrase is technically correct only in the narrow sense that the technician was present in the jury room after the jury had started deliberations and before it had finished.  But, to the extent it conjures the image of jurors actively discussing the merits of the case while the technician is in the jury room, it is misleading.

The juror interviews indicate only that the technician was present for a few minutes. None of the jurors indicated that deliberations occurred during this time.  Further, as noted below, the jury had been expressly instructed to deliberate only in private at the conclusion of the case.  It was not to discuss the case "with anyone."  This injunction applied "throughout your

---

[10] *See United States v. Porter*, 881 F.2d 878, 889 (10th Cir. 1989) ("Although the jury here requested advice from the court because it was unable to agree, the jurors' affirmative responses to the judge's query regarding whether they would be able to reach a verdict if given more time indicates that they were not hopelessly deadlocked.").

[11] *United States v. Horn*, 583 F.2d 1124, 1127 (10th Cir. 1978) (further citation omitted).

service as a juror in this case." The court presumes that the jury followed these instructions,[12]

and there is no evidence to rebut this presumption.

**C.      The Court's properly instructed the jury on deliberations.**

The Court's preliminary oral instruction directed deliberations would occur only at the

end of trial, and there was to be no discussion with any person not on the jury:

> don't have any conversation about this case in any way with anyone, not even
> with each other.  Once the evidence and the instructions have been given to you
> and you retire to deliberate on your verdict, at that point, of course, you will
> discuss the case with each other.

And again:

> And certainly don't communicate with anyone else at all about matters relating to
> this trial throughout your service as a juror in this case.  And that means don't talk
> to them on the phone, don't visit with them in person, don't send them text
> messages or emails or Twitter or whatever that stuff is.   Just have no
> communication about anything having anything to do with this case with anyone
> at all until you've been discharged from this jury.

The Court followed up this instruction at the end of each trial day to "remember the

admonition of the Court," that is, they were not to speak about case "with anyone else at all."

Again, they were not to "talk about this case with anyone or let them discuss it with you."

At the conclusion of the trial, the Court formally instructed the jury in Instruction 28:

> If, during your deliberations, you should desire to communicate with the
> court, please reduce your message or question to writing, signed by the foreperson
> or one or more of you, and pass the note to my clerk, who will bring it to my
> attention.  I will then respond as promptly as possible, either in writing or by
> having you return to the courtroom so that I can address you orally.  I caution you,
> however, with regard to any message or question you might send, that you should
> never state or specify your numerical division at the time.

---

[12] *Bland v. Simmons*, 459 F.3d 999, 1015 (10th Cir. 2006) ("The jury is presumed to follow its
instructions") (citing *Weeks v. Angelone*, 528 U.S. 225, 234 (2000)).

> During your deliberations, *you must also not communicate with, or provide any information to, anyone about this case by any means*. None of you should ever attempt to communicate with me about the merits of the case in any way other than by a signed writing. I will not communicate with any of you on any subject involving the merits of the case other than in writing, or orally here in open court.[13]

This formal written instruction was then complimented in the Court's closing oral remarks to the jury, which explained that they would receive the exhibits, and assistance in how to operate the electronic equipment in the jury room:

> Ladies and gentlemen of the jury, the case is now fully submitted to you for your deliberations. You will retire to the jury room to deliberate. Shortly we will bring the evidence to you. The evidence that's been presented in forms of documents, photos, or video will be an electronic medium that you can access, and there will be someone in the jury room that will instruct you how to do that.

Finally, the prohibition on deliberations in the presence of persons who were not on the jury is also implicitly reflected in the Court's exclusion of the alternate jurors. The Court thanked them for their service, asked they remove their personal effects from the jury room and provide contact information "if you're needed to substitute in for the jury." This was required, the Court explained, because "[t]he alternates will not be permitted to deliberate with the jury" unless and until a substitution was required.

**D.     The Burden is on the Defendant to show Prejudice.**

To support his collateral challenge to his conviction, the Defendant must show that his rights were violated, and that this resulted in actual prejudice, and "relief is proper only if the

---

[13] Instruction 28 (emphasis added).

federal court has grave doubt about whether a trial error of federal law had a substantial and injurious effect or influence in  determining the jury's verdict."[14]

Thus, when alleging constitutional error, "the petitioner must establish an error of constitutional magnitude which had a substantial and injurious effect or influence on the verdict."[15]

In addition, to support his claim of ineffective assistance of counsel, Defendant must show both that his counsel performed deficiently, and that he suffered prejudice as a result.[16] The first prong requires a showing that "counsel's representation fell below an objective standard of reasonableness."[17]   Under the second prong, a defendant must affirmatively prove prejudice in the form of "a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[18]  "The likelihood of a different result must be substantial, not just conceivable,"[19] taken in light of "the totality of the evidence before the judge or jury."[20]

The Court finds that Defendant has failed to show the existence of any constitutionl violation, or any violation (if it did exist) caused him prejudice.

---

[14] *Davis v. Ayala*, 576 U.S. 257, 267-68 (2015) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).).

[15] *United States v. Johnson*, 995 F. Supp. 1259, 1261 (D. Kan. 1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

[16] *See Strickland v. Washington*, 466 U.S. 668, 682 (1984).

[17] *Id*. at 688.

[18] *Id*. at 694.

[19] *Harrington v. Richter*, 562 U.S. 86, 112 (2011)

[20] *Strickland*, 466 U.S. at 695.

**E.      Defendant's attempt to shift the burden is mistaken.**

Defendant cites several cases in support of his argument that the Court should presume prejudice based on the entry of the IT technician into the jury room, either because this entry happened "during deliberations" or because the playback would have been a critical state of the trial at which Defendant had a right be present.   The Court concludes that none of the circumstances of the case warrant any change to the standard requirement that the burden is on the Defendant to show prejudice.

None of the jurors interviewed indicated actual deliberations occurred when the technician was explaining how to operate the video equipment.  But Defendant argues that the verdict is fatally compromised because the jurors did not conclusively deny the possibility that deliberations happened while the equipment was explained.  As noted earlier, such a denial is hardly to be expected after a passage of three years.  Further, the actual statements made by the jurors, coupled with the Court's instructions on how deliberations were to occur, renders Defendant's claims of unfairness untenable.  More importantly, the cases cited by Defendant as warranting a presumption of prejudice bear no actual resemblance to the present case.

Defendant first relies on the Supreme Court's decision in *Remmer v. United States*[21] to support his argument that any outside contact should be deemed presumptively harmful.  In *Remmer*, the Court held that "any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court

---

[21] 347 U.S. 227 (1954).

and the instructions and directions of the court made during the trial, with full knowledge of the parties."[22]

But the key word here of course is "private," a qualification highlighted by the actual facts in that case.  During the trial, one of the jurors, who later became the foreperson, spoke to "a person unnamed" who "remarked to him that he could profit by bringing in a verdict favorable to the petitioner."[23]   The court authorized an investigation without informing counsel of the contact, and found that the remark had been made in "jest."  An attempt at potential bribery by an unknown person is a far cry from the present case.

In the present case, the incidental conduct with the jury was not a "private communication" under *Remmer*.  It was expressly authorized pursuant to the "directions of the court made during trial," specifically, that "and there will be someone in the jury room that will instruct you how to" access the evidence that was submitted in "an electronic medium."

Defendant also relies heavily on the 1934 decision in *Little v. United States*,[24] in which the jury sent a note to the judge asking for the indictment, certain exhibits, and a copy of the court's instructions, which had been presented orally.  The court granted the request for the indictment and certain evidence, but (in keeping with contemporary practice) did not sent a written copy of the instructions.  Rather, the court stated it would "instruct the stenographer to attend in the jury room and read the instructions in their entirety from beginning to end, with no repetition of any part, or emphasis on any part."

---

[22] *Id*. at 229.

[23] *Id*. at 228.

[24] 73 F.2d 861 (1934).

On appeal, the Tenth Circuit found no error in sending a copy of the indictment or instructions, but found that sending the stenographer to the jury room to read back the instructions outside the presence of the parties was erroneous:

> [S]ending a stenographer into the jury room, there to read, in the absence of the defendant and his counsel, the charge of the court, stands in very different stead. No harm may come from it, it is true; but on the other hand, a mistake in the reading of a shorthand symbol which defense counsel would instantly detect, an unconscious or deliberate emphasis or lack of it, an innocent attempt to explain the meaning of a word or a phrase, and many other events which might readily occur, would result in irremediable prejudice to the defendant. Underneath that phase of it lies the proposition that no one should be with a jury while it is engaged in its deliberations. The jury system is founded upon the proposition that disinterested jurors will hear the evidence in open court, and upon that evidence and that alone, deliberate among themselves until a verdict is reached. To permit various persons, under one pretext or another, to be with the jury in its deliberations is to open the door to grave abuse and to strike directly at the heart of the system.[25]

The Tenth Circuit distinguished cases in which written communications were sent into the jury room:

> [W]here an outsider is present in the jury room during its deliberations, a different situation is presented. What went on cannot be determined by examining an undisputed writing, but can only be ascertained by exploring the deliberations of the jury room, a procedure adopted only in extreme cases and then reluctantly. No case is cited holding that the presence of an outsider in the jury room during its deliberations was harmless error . . . . In the case at bar, the record is silent as to what occurred in the jury room. There is nothing therefore in this record to support a finding, affirmatively made in the cited cases, that the error was necessarily harmless.[26]

The court then concluded that the verdict could not stand, whether or not there was any actual showing of harm by the defendant:

---

[25] *Id.* at 864 (citations omitted).

[26] *Id.* at 865 (citation omitted).

In this case we know nothing of what went on while the stenographer was in the jury room; it is entirely possible that a shorthand character was misinterpreted; emphasis play an important role in transmission of ideas by word of mouth, and the difficult injunction of the court to avoid any emphasis is no assurance that there was none.  What else may have occurred, we do not know.  No outsider has any business in the jury room; much harm could result, and that is enough.  The record failing affirmatively to disclose that no prejudice did result, the verdict cannot stand.[27]

However, a half century later the Tenth Circuit reached a different result in *United States v. Dempsey*.[28]  In that case the district court had appointed a sign language interpreter to assist a deaf juror during trial and deliberations.  The Tenth Circuit first rejected the defendants' argument that this arrangement violated the rules regarding the secrecy of deliberations.  The court next addressed the possibility that the interpreter might have affected course of deliberations:

That leaves one further line of inquiry. Kondrodis [the interpreter] was in the jury room.  How do we know that she did not participate in the deliberations by facial expressions, pauses, gestures or otherwise, influencing [the deaf] juror Hoffman and perhaps the others?  And how do we know that she correctly interpreted or did not influence Hoffman's vote by selectively reporting conversation when two jurors were talking at once?

We cannot know for sure.  But we do know that she swore an oath to interpret correctly under penalties of perjury and that the trial judge admonished her that she was not "in any way to express any ideas . . . opinions . . . or observations.  You are strictly an interpreter."  We know she told the court after jury deliberations that she took no part in the deliberations other than to translate. We know also that if she acted properly as an interpreter, she was translating to sign at all times that any juror other than Hoffman was speaking. Thus she was no quiet observer free to grimace, nod, or shake her head in agreement or disagreement with the discussion.  Finally, no allegation of any impropriety by the interpreter while in the jury room has been made either by Hoffman, who could read lips and who spoke for herself, or by any other juror.[29]

---

[27] *Id*. at 867.

[28] 830 F.2d 1084 (10th Cir. 1987).

[29] Id. at 1091.

Defendant cites the first part of this passage (the "how do we know?" part) without noting the second—the conclusion that, absent some grounds for finding an impropriety, the defendant's rights were not violated.  Nor does the Defendant note the holding in *Dempsey* that the Court may rely on relevant oaths to infer that substantial constitutional rights were not violated.

In *Dempsey*, the court relied on the interpreter's statement under oath that she did not participate in the deliberations.  Here, as noted elsewhere, the jury, under oath, had been explicitly instructed not to discuss the case with any person not a member of the jury.  Deliberations were to be privately conducted.

In addition to the claim that prejudice arises from any outsider having any contact with the jury, Defendant also argues that prejudice arises because he, and his attorney, were not notified by the Court of the jury's request, and were not allowed to be present.  Defendant cites *Untied States v. Freeman*[30] for the proposition that any technical assistance to the jury is a critical stage of the trial which requires the attendance of a defendant.  But that case bears little resemblance to what happened here.  In *Freeman*, the outsider in the jury room showing the jury how to operate sound equipment was an FBI agent.  In reaching its conclusion, the court stressed the fact that the agent was not a neutral participant.

> In the circumstances of this case the FBI agent should not have been in the jury room to operate the sound equipment.  When the government learned of the activities of the agent, it should have requested an immediate hearing, but it did not.  Without such a request, the court of its own motion should have ordered an immediate hearing. It did not.  The agent was an adversary.  Absent a stipulation

---

[30] 634 F.2d 1267 (10th Cir. 1980).

19

> by the parties and the approval of that stipulation by the court, the agent should not have been in the jury room.[31]

The court held that no showing of harm was necessary, and that defendant was deprived of a fair trial because "[t]he danger of improper influence adheres in every contact between *an interested party* and a jury.[32]

Again, the Court finds no resemblance between the cited case and this matter. The Court IT technician is in no sense an "interested party." Rather, the technician interreacted with the jury consistent with the court's instruction that the jury would be shown "how to" operate the video equipment. The interaction was not a critical stage of the trial.

It is true that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure."[33] But the Tenth Circuit has also held that the replaying, upon the jury's request during deliberations, of a tape recording which had been admitted into evidence was not a critical state of the trial requiring the defendant's presence.[34]

Defendant, cites *Fisher v. Roe*,[35] in which the Ninth Circuit held that a defendant's absence when the trial court responds to a playback request is a constitutional violation, subject to harmless error analysis. The court observed generally that "[a] defendant's absence from readback proceedings is properly characterized as trial error, rather than structural error, and is

---

[31] *Id*. at 1269.

[32] *Id*. at 1270 (emphasis added). .

[33] *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987).

[34] *Valdez v. Gunter*, 988 F.2d 91, 93-94 (10th Cir. 1993).

[35] 263 F.3d 906, 915-18 (9th Cir. 2001), *overruled in part on other grounds by Payton v. Woodford*, 346 F.3d 1204, 1217 n. 18 (9th Cir. 2003), *rev'd on other grounds sub nom. Brown v. Payton*, 544 U.S. 133 (2005).

therefore subject to constitutional harmless error review."[36]   The court observed that the readback in the case at issue "occurred not only in the absence of the defendants and their lawyers, but without their knowledge and participation,"[37] and that they

> could have made certain, where appropriate, that testimony of defense witnesses was read as well as that of the state's witnesses.  They could also have ensured that any cross-examination of prosecution witnesses would be read in addition to direct testimony.  They could also have made certain that the court reporter's notes were accurate, that her notes accurately reflected the witnesses' testimony, and that she did not unduly emphasize any part of the requested testimony or use any improper voice inflections."[38]

But the court also stressed "the unique facts of this case," which included the fact that the defendant's counsel was "completely and unilaterally excluded" from the readback.[39]   Further, the court noted "the total lack of a record of what happened during the readback," including even such information as which testimony was readback or even the total number of witnesses involved.[40]

Subsequently courts have recognized the factual limitations of *Fisher*.[41]   Nor has Defendant cited, or the Court been able to locate, any authority expanding the application of *Fisher*'s "critical stage analysis" beyond a stenographer's readback to any and all forms of

---

[36] *Id.* at 917.

[37] *Id.* at 916.

[38] *Id.* at 917.

[39] *Id.* at 916, 917.

[40] *Id.* at 918.

[41] *See Gilley v. Madden*, 2020 WL 7239578, at *30 (E.D. Cal. 2020) ("The court in *Fisher* however, acknowledged that the inquiry as to whether a defendant's rights will be adversely affected by his absence from a readback is fact-sensitive, and limited its holding to the facts before it."); *Caddell v. Foulk*, 2014 WL 2557836, at *13 (C.D. Cal. 2014) (Under *Fisher*, "whether a readback of testimony was a critical stage of a criminal trial is a fact-sensitive inquiry, and varies from case to case.").

incidental contact with court employees. The present case does not involve any "readback" of evidence (as in *Fisher*), just as it does not involve any "readback" of the instructions (as in *Little*). The concerns noted in those cases of (respectively) a possible "improper voice inflection" on certain evidence or "an unconscious or deliberate emphasis" on certain instructions is not an issue in the present action. There is no evidence at all that the Court's IT technician did any action other that to show how the video equipment operated.

Defendant also cites the decision of the First Circuit in *United States v. Monserrate-Valentin*,[42] which dealt with a due process challenge to the district court's allowing a technician to replay audiotapes to the jury during deliberations was not error. Or more particularly, Defendant cites that part of the opinion in which the court observed:

> There is always the risk that said person, extraneous to the jury, may inject extrinsic evidence into the deliberative process, by making comments or gestures to the jurors during the playback, editorializing the tapes, or playing back portions of the tapes which were not admitted into evidence.[43]

Defendant argues that the replay of Government's exhibit 10 was error without the adoption of the sort of procedures adopted by the district court in *Monserrate-Valentine*.

But, as with his treatment of *Dempsey*, Defendant gives only a fraction of the context of the cited language. After noting the split among Circuits as to whether any playback of recorded evidence is a critical stage of the prosecution, and immediately before the passage cited by Defendant, the court observed that as a general rule the playback of recorded evidence is *not* a critical stage of a criminal trial:

---

[42] 729 F.3d 31 (1st Cir. 2013).

[43] *Id.* at 59.

> We fail to see how these types of recordings are any different from the other types of documentary evidence that are routinely reviewed by jurors during their deliberations.   In fact, trial courts around the country often provide juries with admitted tape recordings and transcripts before they begin deliberating. Therefore, appellants have failed to persuade us that a mere playback to the jury of an admitted recording is a stage of the trial implicating a defendant's rights under the Confrontation Clause.[44]

The need for additional procedural safeguards in *Monserrate-Valentin* was based on the unusual facts involved.  The jury sent a note to the court during deliberations:

> signed by two jurors asking to hear the recording "talking about El Viejo and El Grandote."  The note was accompanied by the CDs of the two taped conversations between [defendant] Matos and Informant Irene that were admitted into evidence. However, both parties and the district court realized that there were no recordings admitted into evidence that explicitly referenced either "El Viejo" or "El Grandote."   The admitted recordings only depicted Matos talking about "connections" he had inside Loomis, but he never mentioned anyone specifically by name.[45]

The recorded conversations did not directly implicate El Viejo and El Grandote or explain who they were.   Their identity was established only in separate cross-examination testimony.  The district court allowed the replay without, as defendants wished, any reference to the cross-examination testimony.  It was at this point that the First Circuit distinguished the general rule that the replay of recorded evidence is not a critical stage of a trial.  In a passage immediately preceding the language quoted by Defendant, the court stated:

> We believe, however, that *in certain circumstances* a defendant's due process rights and his right to a fair trial may be jeopardized if the district court fails to take adequate precautions during the playback of the recordings.  *This problem realistically arises when the jury is not provided with the recordings prior to its deliberations or is not provided with a means by which to replay the tape recordings on their own inside the jury room.*[46]

---

[44] *Id.* at 59 (citation omitted).

[45] *Id.* at 56-57.

[46] *Id.* at 59 (emphasis added).

23

These circumstances are not present here.  The video evidence was admitted into evidence during the trial, and expressly made available for the jury's review in the jury room. The Government's attorney, without objection, urged the jury to conduct a careful examination of the video.  There is no evidence that the IT technician actually played the video for the jury. Rather, the interviewed jurors stated that the technician was called to address "a tech issue" as to "how to work the video."  The IT technician "fix[ed] the problem."  He "helped the jury work the equipment and then left."  The statements indicate that the jury then watched the video, "many times, and watched it frame-by-frame," while it was operated by "someone on the jury, possibly the foreman."

In short, there is nothing which would render the case as the unusual sort of event which would render the how-to demonstration a critical event in the trial, or otherwise warrant a presumption of prejudice to Defendant.

Finally, Defendant also cites other cases outside the Tenth Circuit, including *Witherspoon v. Stonebreaker*,[47] and *United States v. Chadwell*.[48]

In *Witherspoon*, the jury asked to see an enlarged, freeze frame from a video, which at trial had been played without pause, and asked the court for the defendant to stand up so they could compare the two.  But *Witherspoon* did not address a defendant's right to be present— counsel and defendant were present.  The problem, in that *habeas* action, was that the viewing was not consistent with South Carolina law, which was interpreted by the court to require that

---

[47] 30 F.4th 381 (4th Cir. 2022).

[48] 798 F.3d 910, 914 (9th Cir. 2015).

evidence submitted during deliberations must closely "mirror" the evidence at trial.[49]  Further, the court did not conclude that the violation itself automatically invalidated the state conviction, it proceeded to conduct a prejudice analysis, stressing that the jury had previously announced itself deadlocked and the court had been forced to issue an *Allen* instruction.

Conversely, *Chadwell* was decided under a Ninth Circuit requirement that any playback of tape recorded conversations during deliberations automatically triggers the right to be present.[50]  And even so, the court indicated that the violation was subject to harmless error analysis.

In sum, Defendant has supplied no persuasive authority for the proposition that any incidental contact with a court employee, even one performing a purely ministerial activity consistent with the instructions of the court (here, demonstrating how to operate video equipment) is a critical stage requiring the presence of Defendant and his attorney.

Whether characterized as a putative violation of his right to impartial jury, his right to fundamental fairness, or his right to be present at critical stages of the trial, Defendant has presented nothing in the way of persuasive authority which would support altering the standard burden of proof for his collateral attack on the verdict.

Nor, as Defendant claims in his summation brief, is this a matter even of "equipoise" in the evidence.  None of the jurors interviewed stated that any deliberations actively occurred

---

[49] *See* 30 F.4th at 395 (Under South Carolina law, "any evidentiary presentation that is made during jury deliberations must 'mirror[ ] the way in which the evidence was presented at trial.' ") (quoting *State v. Winkler*, 388 S.C. 574, 698 S.E.2d 596, 602 (2010)).

[50] *See United States v. Kupau*, 781 F.2d 740, 743 (9th Cir.), *cert. denied*, 479 U.S. 823 (1986).

during the IT technician's presence.  No juror stated that the technician did anything other than show how to work the equipment.

Defendant's augment for presumptive violation not only requires ignoring these statements, but an assumption that the jurors blatantly violated their oaths and the Court's instructions.  The great weight of authority is that incidental contacts with court personnel do not violate a defendant's right to be present at critical stages of the trial.[51]  The IT technician's explanation of how the video equipment operated was a ministerial activity which was not a critical stage of the trial.  Defendant has presented no reason to either find or presume prejudice from this ministerial contact.

## F.   Defendant's rights were not violated when the jury watched the video in a frame-by-frame fashion.

Defendant also complains that jury was allowed to view the video in a format other than what was presented at trial.  He argues that viewing the video in slow motion allowed the jury to view the evidence in "a manner in which neither party had presented the video at trial."  Thus, he

---

[51] *See Rogers v. United States*, 422 U.S. 35, 40 (1975) ("[A] violation of Rule 43 may in some cases be harmless error."); *United States v. Roberts*, 913 F.2d 211, 215-16 (5th Cir. 1990) (finding no plain error in district court's rejection of defendants' claim that case manager's entry into jury room to discuss scheduling matters might have been "some sort of subtle coercion toward a verdict"); *United States v. Martinez-Camargo*, 765 F. App'x 205, 210 (9th Cir. 2019) (defendant's constitutional and Rule 43 rights not violated when, outside his presence, "the judge instructed the courtroom clerk to speak with the jury and confirm which portions of the interview they wished to review constituted a critical stage of the proceedings"); *United States v. Finze*, 234 F. App'x 803, 805 (9th Cir. 2007) (law clerk who read instructions aloud on behalf of judge suffering throat illness "was simply a ministerial mouthpiece, exercising no Article III power over a critical stage of the trial"); *Shohatee v. Jackson*, 257 F. App'x 968, 970 (6th Cir. 2007) (playback of testimony is not a critical stage of criminal prosecution); *United States v. Johnso*n, 645 F. App'x 954, 964 (11th Cir. 2016) (judge sent new verdict form to jury in response to jury request, "nothing in this ministerial act that required legal aid for Williams or threatened potential substantial prejudice to him"); *Dallago v. United States*, 427 F.2d 546, 553 (D.C. Cir. 1969) (mechanical operation of transmittal to the jury of items fully in evidence is a ministerial activity that is not a critical stage of the trial for Sixth Amendment purposes); *Copeland v. Renico*, 2006 WL 2325060, at *8 (E.D. Mich. 2006) (defendant's right to counsel not violated by attorney's temporary absence while videotape was played, as "the videotape was already admitted as evidence").

contends his rights were violated by the jury's ability to use the video equipment to pause the video, and thus examine it in virtually a frame-by-frame fashion.  As with the claim that the IT technician intruded on deliberations or that the playback was a "critical stage of the trial," the Court finds that this claim lacks merit.

During the hearing on how to proceed on Defendant's Motion to Vacate, the Court inquired why such an examination of evidence admitted at trial without objection would be a problem.  How, for example, would such a review of video evidence be any different from a jury giving particular attention to one page of a lengthy document?  Or, for that matter, if a lengthy video is submitted for purposes of completeness, is the jury not allowed to replay on the relevant portion, or must it watch the entire video each time?   Indeed, is even pausing the video improper if it was not paused at trial?

Counsel for Defendant responded that "the other person in the jury room is probably the bigger concern," but adhered to the argument that any examination by the jury of the evidence in a "manner" other than as presented at trial violates a defendant's rights.

The Court finds that no merit to the complaint.  First, the trial did focus on particular passages from the critical video, Government Exhibit 10.  That the video was viewed, if not in extended frame-by-frame fashion, at least in slow motion and with emphasis on particular frames, is corroborated in the trial transcript:

> MR. TREASTER: Your Honor, may I publish the video clip, Government's 10?
> THE COURT: Do you plan to publish the clip or the stills of the clip?
> MR. TREASTER: The video clip first, Your Honor
> THE COURT: All right.
> MR. TREASTER: Go ahead.
> (Viewing Government's Exhibit No. 10.)

MR. TREASER: Stop.

BY MR. TREASER:

Q.   Okay. Did we just see the two firearms?

A.   Yes.

Q.   Okay. And what else was in there?

A.   The table is basically what would be off to Mr. Briscoe's right. And so on the right there was what appeared to be Government's Exhibit 1 and 2, the Camel cigarettes, and then on the floor in front of him appeared to b e two magazines that were loaded with ammunition.

MR. TREASER: Okay. Go ahead. Finish it out.

MS. HESTON: That's it.

Agent Chaffee was on the stand when the video was played.  After the viewing of the video was completed, he was asked about two Exhibits (10a and 10b).  He explained they were still photos taken after a frame-by-frame review of the video.  He testified:

> Yeah.  In going through the video, I'll try to go frame by frame by frame to slow it down to be able to get—so I can make sure that it is what I'm seeing on the video is what I think it is.  And so in doing so, I'll take video clips or, I'm sorry, snippets of the video to make it a photograph to be able to compare it to.  And so what this is are snippets from the video that I had taken.

Even if the video was not played in frame-by-frame fashion when it was first presented in evidence, counsel for the Government suggested in closing argument that that's just what the jury should do in deliberations:

> And in Officer Derusseau's dashcam video, you can see clearly the defendant running from the vehicle, carrying a dark-colored bag.  And you can even—if you stop it and look at it frame by frame, you can even see the drawstrings dangling as he runs along behind—behind him in his left hand.
> . . . .
>
> And you can look at these videos that we've presented to you, that we've put into evidence, the dashcam videos, the Axon videos, the video clip, Government's Exhibit 10, and you can review them and you can slow them down and you can look at them frame by frame to see exactly what the witnesses were talking about as they testified.

28

Careful examination of the video was a important issue in the action, one which had ben expressly raised during the evidence and during argument. That the jury did in fact undertake this analysis violated no constitutional right of Defendant. Similarly, the ministerial action of the IT technician as to "how to" operate the video equipment neither violated any right of Defendant, or caused him any prejudice.

Defendant's rights were not violated by the jury's decision to view the video in slow motion or with period pauses. The cases cited by Defendant do not prohibit the jury from performing common sense or reasonable judgment to review the admitted evidence, or to focus on particular portions of it.[52] In *United States v. Plato*,[53] the Seventh Circuit rejected the argument that the jury's slow motion review of a video originally played during trial at full speed was a violation of the defendant's Sixth Amendment rights. The court responded:

> We cannot see how; the surveillance video—the authenticity of which was unquestioned—had already been admitted into evidence and played for the jury in its entirety. Graham had ample opportunity to address the contents of the video during trial, and his counsel discussed it at length in his closing. *There is nothing unusual about jury requests to more closely examine certain items of evidence during deliberations*, especially key evidence like a surveillance videotape capturing the crime.[54]

**Conclusion**

The Court finds no violation of Defendant's constitutional rights to representation of counsel, to attend critical stages of the trial, for fundamental fairness, or an impartial jury. There

---

[52] As noted earlier, in *Witherspoon* the problem arose not simply because the jury asked for the video to be played and frozen at a certain point, they also asked for the defendant to stand alongside the video for comparison. This was found to error under applicable state law. *See* 30 F.4th at 395 ("[W]ith Witherspoon [standing] beside the freeze-frame, the stand-up display certainly did not 'mirror' the display of the surveillance video during trial.").

[53] 629 F.3d 646 (7th Cir. 2010).

[54] *Id*. at 652 (emphasis added).

was also no violation of the Defendant's right under Rule 43 to attend critical stages of the trial. The Court finds that Defendant's trial counsel was not objectively deficient.  Any request, for example, for the attendance of Defendant or counsel at the the technical demonstration of how to operate video equipment would have been properly denied by the Court, as would any objection to the slow motion replay.  Similarly, Defendant has failed to any prejudice arising from any error or violation, even if it were otherwise shown to exist.

**IT IS ACCORDINGLY ORDERED** that Defendant's Motions to Vacate (Doc. 138), for Discovery and Hearing (Doc. 139), and to Strike (Doc. 164) are **DENIED.**

**IT IS SO ORDERED** this 19th day of April, 2023.


ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE